UTICA MUTUAL INSURANCE
COMPANY, Appellant–
Defendant,

v.

PRECEDENT COMPANIES,
LLC, Appellee–Plaintiff.

No. 49A04–0209–CV–416.

Court of Appeals of Indiana.

Jan. 31, 2003.

Charles W. Linder, Jr., Sharon L. Wright, Linder & Hollowell, Indianapolis, IN, Attorneys for Appellant.

Michael E. Brown, Eric D. Johnson, Ginny L. Peterson, Kightlinger & Gray, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Utica Mutual Insurance Company ("Utica") appeals from the trial court's entry of

summary judgment in favor of Precedent Companies, LLC ("Precedent").[1] Utica presents two issues on appeal, one of which we find dispositive: whether the trial court erred as a matter of law when it determined that the insurance policy Utica issued to Precedent covers Precedent's claimed loss.

We reverse and remand with instructions.[2]

## FACTS AND PROCEDURAL HISTORY

On November 11, 1998, Precedent issued check number 41719 in the amount of $134,817.12 made payable to Fidelity Title Company ("Fidelity"). Precedent issued the check to fund a residential loan to Ross and Kelli Fazekas. On the bottom portion of the document containing the check, the following statement appeared:

### DETACH AND RETAIN THIS STATEMENT

THE ATTACHED CHECK IS FUNDING TO CLOSE THE ABOVE–REFERENCED LOAN. IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED. IF CIRCUMSTANCES PREVENT A SCHEDULED CLOSING FROM OCCURRING, PLEASE INVALIDATE THE ACCOMPANYING CHECK AND IMMEDIATELY RETURN IT TO THE PAYOR.

The Fazekas' loan did not close and was never funded. But on December 14, 1998, Fidelity deposited the check into its bank account. The check cleared Precedent's bank account on December 17, 1998.

On November 30, 1998, Precedent discovered that the Fazekas' loan had not closed, and on January 13, 1999, learned that Fidelity had deposited the check. Subsequently, Precedent learned that Fidelity's business had closed in December 1998.[3]

Utica had issued an insurance policy, Financial Institution Bond No. 2241480, to Precedent with effective dates of May 12, 1998 to May 12, 1999. In January 2001, Precedent filed a Complaint for damages under the policy with Utica. In particular, Precedent alleged that the following policy provisions provide coverage for its loss:

### FIDELITY

(A) Loss resulting from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

a) to cause the insured to sustain such loss; and

b) to obtain financial benefit for the Employee or another person or entity.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

---

1. At some point during these proceedings, Precedent changed its name from Precedent Mortgage Company to Precedent Companies, LLC.

2. We deny Utica's Motion for Oral Argument.

3. On February 16, 1999, Precedent filed a Complaint against Fidelity in the Marion Superior Court and asserted the following claims: (1) Criminal Conversion; (2) Common Law Conversion, (3) Money Had and Received, and (4) Breach of Fiduciary Duty.

## ON PREMISES

(1) Loss of Property resulting directly from

(a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof, or

(b) common-law or statutory larceny, committed by a person present in an office of the Insured covered by this bond while the Property is lodged or deposited within

(i) any of the Insured's offices covered under this bond, or

(ii) offices of any financial institutions, or

(iii) any premises where the Insured leases safe deposit boxes.

## IN TRANSIT

(C) Loss of property resulting directly from robbery, common-law or statutory larceny, misplacement, mysterious unexplained disappearance, being lost or made away with, and damage thereto or destruction thereof, while the Property is in transit anywhere in the custody of

(a) a natural person acting as a messenger of the Insured (or another natural person acting as messenger or custodian during an emergency arising from the incapacity of the original messenger).

## FORGERY OR ALTERATION

(D) Loss resulting from Forgery or alteration of, on, or in any Negotiable Instruments (except registered or bearer obligations) made or drawn by or drawn upon the Insured, or made or drawn by one acting as agent of the Insured; or purporting to have been made as herein before set forth;

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.[4]

In September 2001, Utica filed a Motion for Judgment on the Pleadings, arguing that its policy does not cover Precedent's loss. In response, Precedent filed a Motion for Summary Judgment, and Utica eventually filed its Cross Motion for Summary Judgment. In July 2002, the trial court issued a general order granting Precedent's summary judgment motion and denying Utica's motion. After Utica filed a Motion to Correct Error, the court entered an Amended Entry on Summary Judgment, in which it reduced the amount of money judgment previously entered. This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

When reviewing the grant or denial of summary judgment, we use the same standard used by the trial court. *Allstate Ins. Co. v. Smith,* 656 N.E.2d 1156, 1157 (Ind.Ct.App.1995). Summary judgment is appropriate only when the evidentiary matter designated by the parties shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.;* Ind. Trial Rule 56(C). This court has observed that questions involving the interpretation of an insurance policy are generally questions of law and, thus, are particularly well suited for summary disposition. *Union Sec. Life Ins. v. Acton,* 703 N.E.2d 662, 664 (Ind.Ct.App.1998), *trans. denied.* In the context of cross-motions for summary judgment, the trial court must deal with each motion separately, construing the facts and inferences to be drawn therefrom in a light most favorable to the non-moving party. *Allstate,* 656

4. The policy defines "Property" to include negotiable instruments.

N.E.2d at 1157. If the facts are undisputed, our task is to determine the law applicable to those facts, and whether the trial court correctly applied it. *Id.*

### Coverage Under the Policy

Utica asserts that the trial court erred as a matter of law when it granted summary judgment in favor of Precedent. Specifically, Utica contends that none of the four policy provisions Precedent relies upon provide coverage for its loss and, thus, that the court should have entered summary judgment in favor of Utica.

■ The interpretation of an insurance contract is primarily a question of law for the court. *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind.1992). And contracts for insurance are subject to the same rules of interpretation as are other contracts. *Eli Lilly and Co. v. Home Ins. Co.,* 482 N.E.2d 467, 470 (Ind.1985). "In construing a written insurance contract, we may not extend insurance coverage beyond that provided in the contract, nor may we rewrite the clear and unambiguous language of an insurance contract." *American States Ins. Co. v. Adair Indus., Inc.,* 576 N.E.2d 1272, 1273 (Ind.Ct.App.1991) (citation omitted). When interpreting an insurance policy, we give plain and ordinary meaning to language that is clear and unambiguous. *Westfield Companies v. Rovan, Inc.,* 722 N.E.2d 851, 855 (Ind.Ct.App. 2000). The fact that the parties disagree on the interpretation of the contract does not by itself establish an ambiguity; instead, we will find a contract ambiguous only if it is susceptible to more than one interpretation and reasonable persons would honestly differ as to its meaning. *American States Ins.,* 576 N.E.2d at 1274.

As we have stated, Precedent argued below, and the trial court agreed, that its loss is covered by at least one of the following policy provisions: (1) Fidelity; (2) On Premises; (3) In Transit; or (4) Forgery or Alteration. Utica contends that Precedent's loss does not fall within the plain meaning of the clear and unambiguous language of any of those provisions. We address the parties' claims in turn.[5]

### A. Fidelity Provision

■ Utica first asserts that Precedent's loss is not covered under the fidelity provision of the policy, which provides coverage for "[l]oss resulting from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others." Utica contends, in part, that Fidelity was not Precedent's employee. We must agree.

The policy defines "employee" as:

(1) an officer or other employee of the Insured, while employed in, at or by any of the Insured's offices or premises covered hereunder, and a guest student pursuing studies or duties in any of said offices or premises;

(2) a person provided by an employment contractor to perform employee duties for the Insured . . . ;

(3) an employee of an institution merged or consolidated with the Insured . . . ;

(4) *each natural person, partnership or corporation authorized by the Insured to perform services as data processor of checks or other accounting records of the Insured* . . . ;

(5) [a]n attorney of the Insured while performing legal services for the Insured . . . ;

**5.** The trial court did not enter findings and conclusions, nor did it specify in its summary judgment order under which provision or provisions Precedent's loss was covered. We note that under Indiana Trial Rule 52(A), the court was not required to enter findings.

(6) [a]ny natural person who is a partial owner or partner of the Insured....

(Emphasis added). Precedent asserts that Fidelity falls within subsection (4) of the policy's definition of "employee" and alleges that Fidelity was "performing services to process the checks for the ultimate borrowers." Because the policy does not define the term "data processor," we look to that term's plain meaning. *See Westfield Companies,* 722 N.E.2d at 855. The term "data processing" is defined as, "Conversion of data into a form that can be processed by computer; [t]he storing or processing of data by computer." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 475 (3d ed.1992). And "data processor" means, "A device, such as a calculator or computer, that performs operations on data; [a] person who processes data." *Id.*

Here, Precedent, a mortgage company, issued Fidelity, a title company, a check for the purpose of funding the Fazekas' residential loan. The instructions attached to the check state that the check was for the purpose of funding the loan and that, if the closing did not occur, the check was to be returned. Contrary to Precedent's assertion, Fidelity's function in the transaction was not as a "data processor" of the check. Rather, the check was made payable to Fidelity, and Fidelity deposited the check into its bank account. Precedent's argument amounts to a request that we expand the plain meaning of an unambiguous policy term to provide coverage, which we cannot do. *See American States Ins.,* 576 N.E.2d at 1273. Because Fidelity does not fall within the policy's definition of "employee" as "data processor" of the check, we agree with Utica that Precedent's loss is not covered by the fidelity provision.

**B. On Premises Provision**

■ Next, Utica claims that the policy's "on premises" provision does not provide coverage for Precedent's loss. Precedent responds that that provision covers its loss because the check made payable to Fidelity constitutes "[l]oss of Property resulting directly from ... misplacement ... while the property is lodged or deposited within ... offices of any financial institution." According to Precedent, its funds were "misplaced" when Fidelity disregarded the instructions attached to the check and deposited the funds into its bank account even though the Fazekas' loan did not close.

Once again, the policy fails to define a term central to the parties' dispute, namely, the term "misplaced." Accordingly, we look to the plain and ordinary meaning of "misplaced," which is defined as: "a. To put into a wrong place: *misplace punctuation in a sentence.* b. To mislay: *I have misplaced my wallet.*" THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1155 (italics in original). As an initial matter, Precedent's funds were clearly not mislaid. Precedent gave the check to Fidelity, and Fidelity subsequently deposited the check into its bank account. And Precedent does not assert that, at any point, either it or Fidelity was unaware of the check's physical location.

But we find some merit in Precedent's argument that Fidelity put Precedent's funds into the wrong place when it negotiated the check even though the loan did not close.[6] But even if we were to assume Fidelity misplaced the funds, the unambiguous language of the provision requires that the misplacement occur *while the property is lodged or deposited within* offices of a financial institution. If Fidelity

---

**6.** We agree with Precedent that, contrary to Utica's argument, the provision's language does not require that the insured misplace the property for coverage to exist.

misplaced the funds, it did so when it deposited the check into its bank account. However, the funds were not misplaced *while* deposited at Fidelity's bank.

Precedent cites two cases in support of its argument, but those cases support our conclusion that Precedent's loss is not covered by the "on premises" provision. For example, in *Bremen State Bank v. Hartford Accident & Indem. Co.,* 427 F.2d 425, 426 (7th Cir.1970), which involved a similar "on premises" provision,[7] the plaintiff suffered a loss after it had deposited funds into a bank and those funds were lost during a move by the bank from one location to another. Similarly, in *Aetna Cas. & Sur. Co. v. Louisiana Nat'l Bank,* 399 F.Supp. 54, 55 (M.D.La.1975), which contained an "on premises" provision identical to the provision in *Bremen,* the plaintiff incurred a loss after it made two deposits intended for one account, but because of a malfunction of the encoding machine at the bank, operator error, or intentional misconduct, the deposits were encoded with a different account number.

Precedent correctly notes that in both cases, the courts determined that the "on premises" provisions provided coverage for the plaintiffs' losses. *See Bremen,* 427 F.2d at 427; *Aetna Casualty,* 399 F.Supp. at 56. But those cases are clearly distinguishable in that the misplacement in *Bremen* and *Aetna Casualty* occurred while the property was lodged or deposited at the bank. Here, however, there is no evidence that Precedent's funds were misplaced while the property was lodged or deposited in a financial institution. We conclude that Precedent's funds were not "misplaced" in the manner required by the unambiguous language of the policy and,

thus, its loss is not covered by the "on premises" provision.

## C. In Transit Provision

██ Utica also disputes that the policy's "in transit" provision provides coverage. That provision provides, in relevant part, for coverage of "[l]oss of Property resulting directly from ... misplacement ... while the property is in transit anywhere in the custody of ... a natural person acting as a messenger of the Insured ... or a Transportation Company...."

Utica's insurance policy does not define the phrases "in transit" or "natural person." But the plain meaning of the word "transit" is the "[c]onveyance of ... goods from one place to another...." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1901. And Black's defines "natural person" as follows: "A human being, as distinguished from an artificial person created by law." BLACK'S LAW DICTIONARY 1162 (7th ed.1999). Precedent contends that Fidelity misplaced Precedent's funds while the funds were in transit to the ultimate recipient, the borrowers involved in the residential loan. Precedent further asserts that Fidelity falls within the plain meaning of "natural person" because as a corporation, it necessarily acts through its individual agents. But neither of Precedent's arguments is persuasive given the plain meaning of the provision's unambiguous language.

First, as Utica points out, Precedent's check was made payable to Fidelity, and there is no dispute that the check was *not* misplaced in transit from Precedent to Fidelity. The fact that Precedent issued a check made payable to Fidelity for the specific purpose of funding a residential loan does not transform Fidelity, a title company, into a messenger. Moreover,

---

**7.** The "on premises" provision in *Bremen* provided coverage for "[a]ny loss of property through ... misplacement ... while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere...." *Bremen,* 427 F.2d at 426.

Fidelity is a corporation, not a natural person acting as a messenger on Precedent's behalf. While we agree with Precedent that a corporation acts through its officers and agents, the plain and ordinary meaning of natural person expressly excludes legally created entities. *See* BLACK's at 1162. Therefore, the policy's "in transit" provision does not cover Precedent's claimed loss.

### D. Forgery or Alteration Provision

■ The final provision at issue is the policy's forgery or alteration provision, which provides coverage for "[l]oss resulting directly from Forgery or alteration of, on or in any Negotiable Instruments ... made or drawn by ... by the Insured...." Precedent contends that Fidelity altered the negotiable instrument when, contrary to the attached instructions, Fidelity deposited the check even though the Fazekas' loan did not close. Utica responds that while Fidelity may have negotiated the instrument in breach of the conditional delivery, Fidelity did not alter the instrument. Again, we must agree with Utica.

Because the policy fails to define what it means to "alter" a negotiable instrument, the parties direct us both to case law and statutory law for guidance on the plain meaning of an "altered" negotiable instrument. In particular, in support of its argument that Fidelity altered the check, Precedent cites to *St. Paul Fire & Marine Ins. Co. v. State Bank of Salem,* 412 N.E.2d 103 (Ind.Ct.App.1980). In that case, this court addressed whether a negotiable instrument had been materially altered when the drawer had typed the figures "478.23" on the line of the check used to express the amount in numbers, and someone later inserted the typed figures "100" immediately before the "478.23." *Id.* at 113. But the amount written on the line of the check used to express the amount in

words was accurate and conflicted with the altered numerical amount. *Id.* We explained that, under the Uniform Commercial Code ("UCC"), an alteration of a negotiable instrument is material if it changes the contract of a party to the instrument. *Id.* (citing former Indiana Code § 26–1–3–407). And because the written amount controls, we held that any alteration of the check was not material. *Id.*

We agree with Utica that *St. Paul* is inapposite. The issue in *St. Paul* was whether an alteration was *material* under the UCC, not whether the instrument was altered. Moreover, *St. Paul* involved a change made on the face of the negotiable instrument itself. Here, however, Precedent does not allege that Fidelity altered or changed the face of the instrument. Precedent's reliance on *St. Paul* is misplaced.

Additionally, as we noted in *St. Paul,* and as Utica points out, our legislature has defined "alteration" as that term relates to negotiable instruments. Indiana Code Section 26–1–3.1–407 provides in relevant part:

(a) "Alteration" means:

  (1) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party; or

  (2) an unauthorized addition of words or numbers or other change to an incomplete instrument relating to the obligation of a party.

Again, Precedent does not allege, and the undisputed facts do not show, that Fidelity made any unauthorized change in or on the instrument. Nor did Fidelity add words or numbers to the instrument, and the instrument was complete when Fidelity received it.

Still, Precedent asserts that by depositing Precedent's check when the Fazekas'

loan had not closed, Fidelity modified the parties' obligations. We must disagree. Precedent·issued the instrument for a special purpose, and its delivery was conditioned upon the occurrence of a specific event. *See Brames v. Crates,* 399 N.E.2d 437, 441 (Ind.Ct.App.1980) (acknowledging negotiable instrument was subject to condition or for special purpose and holding that parol evidence was admissible to establish special purpose); *Herzog Contracting Corp. v. McGowen Corp.,* 976 F.2d 1062, 1070 (7th Cir.1992) (discussing admissibility of parol evidence where party to negotiable instrument raises "special purpose" defense); *see also* Uniform Commercial Code Comment 2 to § 3–305 (discussing conditional issuance and issuance for a special purpose as Article 3 defenses to obligation of a party to pay instrument). While Fidelity may have deposited the check contrary to or in breach of the conditions under which it was delivered, Fidelity did not alter the instrument within the meaning of Indiana Code Section 26–1–3.1–407. We, therefore, conclude that the forgery or alteration provision of the policy does not cover Precedent's loss.

## CONCLUSION

The trial court erred as a matter of law when it entered summary judgment in favor of Precedent. And because we hold that the four unambiguous policy provisions do not cover Precedent's claimed loss, we reverse and remand with instructions to the trial court to enter summary judgment in Utica's favor.

Reversed and remanded.

RILEY and VAIDIK, JJ., concur.